STATE OF NEW JERSEY, PLAINTIFF, v. JOHN J. HORN, SR., DEFENDANT.

Bergen County Court

Decided October 29, 1971.

Mr. *Eugene S. Garrett,* Assistant Prosecutor, for plaintiff (*Mr. George F. Kugler, Jr.,* Attorney General for the State of New Jersey, attorney).

Mr. *Thaddeus C. Raczkowski* for defendant (*Messrs. Sailer, Fleming & Raczkowski,* attorneys).

GELMAN, J. J. & D. R. Ct. (temporarily assigned). Defendant appeals from a judgment of conviction entered in the Bergen County District Court for violation of *N. J. S. A.* 39:4–75. The court ordered a plenary trial *de novo* pursuant to *R.* 3:23–8(a) so that both parties would have an opportunity to present a complete record in view of the importance of the issues raised on this appeal.

The essential facts are these: On April 8, 1971 Officer Saccenti of the Bergen County Police Department was detailed with one other county police officer to enforce the gross weight limitation on the Ferry Street bridge in the Borough of East Rutherford. The bridge is maintained by Bergen County and is posted for a maximum load of 15 tons. A permanent sign stating the gross load limit is posted on Paterson Plank Road 500 feet from the bridge entrance and another such sign is located on the bridge itself. The weight limit was fixed by resolution of the Bergen County Board of Freeholders adopted May 6, 1959 pursuant to the authority vested in the board by *N. J. S. A.* 27:19–13. The resolution provided, among other things, that the county police department would be charged with the enforcement of the regulations set forth in the resolution, and that persons violating the weight limitation would be "subject to the punishment prescribed by the provisions of section 39:4–75 of the revised statutes, as amended and supplemented."

On the day in question the weighing team was stationed at the East Rutherford side of the bridge, and they observed defendant driving a tractor-trailer containing a liquid cargo off the bridge. He was directed by the officers to stop, and the tractor and trailer were weighed on a pair of portable scales known as loadometers. The weighing proceedure was as follows: first, the scales were balanced and the driver directed to approach the scales by proceeding up ramps located at each side of the vehicle. The vehicle was then moved forward so that the right and left front wheels of the tractor passed over the runners and came to rest directly on the scales. An officer was stationed at each scale and operated the loadometer to determine the weight registered on his side. Officer Saccenti then checked the weights registered on each of the scales and recorded them on his report, the total of the two readings constituting the axle weight. The vehicle was then moved forward and each axle weight was recorded in turn, except for one axle which could not be weighed because an outside wheel on one side was missing. The total of all the recorded axle weights was found to be 56,220 pounds, or 26,220 pounds in excess of the posted limit.

A summons was issued to defendant by Officer Saccenti, who testified to the facts set forth above. This officer was trained in the use of loadometers between October 1970 and February 16, 1971, when he was certified as a weighmaster by the State Division of Weights and Measures. He further testified that the scales used in the weighing of the vehicle in question were calibrated on March 19, 1971 by the Division of Weights and Measures, and the certificate evidencing the calibration of the scales was introduced in evidence.

██ The officer described, in explicit detail, the weighing procedure which was followed in this case, and there is nothing in the record to suggest that the procedure was incorrect. While counsel urged that such an inference can be drawn because the total axle weight of one side of the

vehicle was 2,000 pounds in excess of the other side, the side-to-side weight differential is readily attributable to the liquid cargo shifting because of a slight beveling of the road surface where the weighing took place. Certainly the differential obtained does not give rise to a reasonable inference that the scales were incorrect or that the weighing procedure was improper. Loadometers are in widespread use by law enforcement agencies throughout the country, and they are a relatively simple but accurate means of determining vehicle or axle weights without seriously delaying commercial traffic. Loadometer readings have been accepted as satisfactory evidence in other jurisdictions to support convictions for vehicle weight violations (see, *e. g., People v. Vinciguerra,* 24 Misc. 2d 63, 203 *N. Y. S.* 2d 953 (Sup. Ct. 1960)), and even assuming that loadometers are "scientific instruments" equivalent to drunkometer devices, the criteria set forth in *State v. Johnson,* 42 *N. J.* 146, 171 (1964), were sufficiently met in this case so as to warrant the acceptance of the results obtained.

█ Defendant's principal contention on this appeal is an asserted lack of authority on the part of county police officers to stop and weigh vehicles or to issue a summons for any weight violation of the Motor Vehicle Act.

*N. J. S. A.* 39:4–75, the Motor Vehicle Act section involved here, does not contain any language limiting its enforcement to a specific class of law enforcement officer. The section states:

No commercial motor vehicles shall be driven over a bridge in this state upon which is posted in a conspicuous place a sign stating the gross weight the bridge will carry, if the gross weight of the commercial vehicle and load is greater than the gross weight stated on the sign.

A person violating this section shall be subject to a fine not exceeding one hundred dollars. In default of the payment thereof imprisonment in the county jail for a period not exceeding ten days shall be imposed.

The owner and operator of any vehicle used in violation of this section shall be responsible to the municipal or other corporation

owning or maintaining such bridge, or to the state if such bridge is maintained by the state, for any damage done to the bridge by reason of the violation.

The Legislature has elsewhere vested general authority to enforce all provisions of the Motor Vehicle Act, without exception or limitation, in "the police * * * of * * * any municipality or county or * * * the State." *N. J. S. A.* 39:5-1. In addition, the authority of the county police is the subject of specific legislation. *N. J. S. A.* 40:22-5 states (insofar as here relevant):

> The [county police] shall have all the powers to enforce * * * all the provisions of Title 39 of the Revised Statutes. * * *

The statutory grant of authority to the county police (and local police as well) to enforce the provisions of *N. J. S. A.* 39:4-75 would appear to be clear, and there is no judicial precedent to support defendant's position. However, he urges that all police officers other than the State Police and motor vehicle inspectors were stripped of authority to enforce any vehicle weight statute by virtue of *N. J. S. A.* 39:3-84.3 and the legislative history preceding its enactment. The first paragraph of *N. J. S. A.* 39:3-84.3 states that

> Any State Police officer or motor vehicle inspector having reason to believe that the size or weight of a vehicle and load is unlawful is authorized to require the driver to stop and submit to a measurement or weighing of the same. * * *

The cited section also provides for the off-loading or redistribution of the excess portion of the load in the event a violation is found, and prescribes minimum and maximum penalties, including a fine measured by the amount of the excess load under certain conditions. The offending vehicle is also subject to detention and its registration may be revoked by the Director of Motor Vehicles.

This section of the Motor Vehicle Act was adopted in 1950 as a part of a comprehensive revision of the law dealing with vehicle weights and dimensions. As originally introduced on March 6, 1950, the provision of *Assembly Bill* 13 (hereafter "the truck bill") corresponding to *N. J. S. A.* 39:3–84.3, authorized "any police officer" to stop and weigh or measure a vehicle believed to be in violation of the act. On March 29, 1950 hearings on the truck bill were held before the Senate Judiciary Committee, and a spokesman for the trucking industry, in commenting upon this section of the bill, urged that it be amended because

[A]t present Motor Vehicle Inspectors and State Police are believed to be the only persons having and exercising this power. *Transcript, Public Hearing on Assembly Bill No. 13, The Truck Bill,* at 38.

Following the hearings the truck bill was amended so as to omit reference to "any police officer" and to substitute instead the present language of *N. J. S. A.* 39:3–84.3.

The question, then, is whether the language of *N. J. S. A.* 39:3–84.3 and its legislative history constituted an implied repeal of county and local authority to enforce *N. J. S. A.* 39:4–75. The answer is in the negative. In the first instance, when the Legislature enacted the truck bill it was aware of the provisions of *N. J. S. A.* 39:4–75. Section 1 of the truck bill specifically referred to *N. J. S. A.* 39:4–75 and stated:

This section shall not be construed to supersede or repeal the provisions of either Sections 39:3–84 or 39:4–75 of this Title. [N. J. S. A. 39:3–20]

It is difficult to conceive that a legislature which proclaimed its intent *not* to disturb an existing statute in one section of a bill would have intended a partial repeal of the statute in the same enactment without expressing that intent in so many words. As the Supreme Court noted in *Henninger v. Board of Chosen Freeholders,* 3 *N. J.* 68 (1949):

Repeals by implication are not favored in the law. In the absence of an express repealer indication of an intention of the Legislature to repeal a prior act must be clear and compelling. There is a strong presumption against such an intention. * * * Wherever possible statutes dealing with the same general subject will be recognized and harmonized. * * * [at 71]

The legislative history of *N. J. S. A.* 39:4–75 confirms the conclusion that an implied repeal was not intended here. As early as 1911 first-class counties were authorized to adopt rules and regulations governing traffic on county roads, including the regulation of truck weights, and to appoint county police officers to enforce such regulations. *L.* 1911, *c.* 272. This authority was further extended in 1918 to include the making and enforcement of "rules and regulations for the protection and use of the viaducts and bridges" by all counties. *L.* 1918, *c.* 185. The 1918 act clearly encompassed the adoption of weight limits for county bridges, and this authority continues to the present day. *N. J. S. A.* 27:19–13. In section 21(6) of the Motor Vehicle Act of 1921 (*L.* 1921, *c.* 208), which is the source of *N. J. S. A.* 39:4–75, the Legislature supplemented the 1918 act by making it a state offense to exceed the posted weight limits on bridges. This section of the act necessarily had reference to weight limits established for county bridges pursuant to the 1918 act, since it mandated civil liability to a county for any damage to the bridge structure caused by a violation of this section. While the next succeeding section of the 1921 Motor Vehicle Act, section 21(7), authorized motor vehicle inspectors to stop and weigh vehicles, the intent there was not to supplant county enforcement of bridge regulations but to extend the same enforcement powers previously granted to county and local officers to state officials as well.* This intent was further manifested in

---

*The juxtaposition of these two sections may have given rise to the belief that only state officials could enforce weight restrictions. It is more likely, however, that this belief arose from the fact that

31(1) of the 1921 Act, which expressly authorized enforcement of any provision of that act by "any * * * police officer."

Hence, when the truck bill was adopted in 1950, all police officers in this State were authorized to enforce the provisions of *N. J. S. A.* 39:4–75 and, as a necessary adjunct of that authority, all police officers were authorized to stop and weigh vehicles to determine the existence of a violation. Nothing in the truck bill or its legislative history suggests an intent to alter the design of the prior law in this respect. Indeed, in the hearings on the truck bill, the proponents of the legislation emphasized that an important purpose of the legislation was to protect bridges in the county road system, and both the then Attorney General and members of the Senate Judiciary Committee expressed concern that there be more enforcement of the law and not less. See *Transcript, supra,* at 71–77.

The amendment to the truck bill prior to its enactment which resulted in the present wording of *N. J. S. A.* 39:3–84.3 is not inconsistent with this view. In that section the Legislature extended enforcement powers under the new law far beyond the mere issuance of a summons, which was then and remains the sole means of enforcing *N. J. S. A.* 39:4–75. Under *N. J. S. A.* 39:3–84.3 the officer can direct the off-loading of the vehicle's cargo so as to reduce the gross weight to the authorized limit, or he can permit a redistribution of the load. The amount of the fine for violation of this section is not less than twice the amount prescribed by *N. J. S. A.* 39:4–75. The vehicle and its contents may also be detained until a bond is posted, and finally, the vehicle registration may be revoked by the Director for a violation of this section of the statute. With-

county and local agencies apparently did not exercise the authority granted to them by the Legislature. Indeed, as the transcript of the hearings on the truck bill makes clear, there was little or no enforcement activity against truck weight violators even by state officials prior to 1950. See *Transcript, supra,* at 76–77.

out passing upon the question whether county police are authorized to enforce *N. J. S. A.* 39 :3–84.3 by reason of the general grant of authority contained in *N. J. S. A.* 39 :5–1 and 40 :22–5, it is apparent that the range of enforcement activity and the penalties authorized are more comprehensive and drastic than under *N. J. S. A.* 39 :4–75. The Legislature could well have decided to limit enforcement of the former to state police and motor vehicle inspectors, while at the same time continuing the existing authority of all police officers to enforce the provisions of *N. J. S. A.* 39 :4–75.

It is concluded, therefore, that county police officers have the authority to enforce the provisions of *N. J. S. A.* 39 :4–75 and to stop and weigh vehicles suspected to be in violation of the weight limits posted for bridges.

It is also urged that the "extension" of law enforcement authority for overweight violations would create an unconstitutional burden upon interstate commerce because vehicles engaged in interstate transportation would be subject to harassment and interference by multiple law enforcement jurisdictions as they made their way into or through the State. However, the right of state governments to regulate vehicle weights and sizes was sustained by the United States Supreme Court in *South Carolina State Highway Dept. v. Barnwell Bros.,* 303 *U. S.* 177, 58 *S. Ct.* 510, 82 *L. Ed.* 734 (1938). Mr. Justice Stone, speaking for a unanimous court, stated:

Few subjects of state regulation are so peculiarly of local concern as is the use of state highways. * * * The state has a primary and immediate concern in their safe and economical administration. The present regulations, or any others of like purpose, if they are to accomplish their end must be applied alike to interstate and intrastate traffic both moving in large volume over the highways. * * *

In each of these cases regulation involves a burden on interstate commerce. But so long as the state action does not discriminate, the burden is one which the Constitution permits because it is an inseparable incident of the exercise of a legislative authority, which, under the Constitution, has been left to the states. [303 *U. S.* at 187, 58 *S. Ct.* at 515, 82 *L. Ed.* at 740]

See also *Morris v. Duby,* 274 *U. S.* 135, 47 *S. Ct.* 548, 71 *L. Ed.* 966 (1927); *Sproles v. Binford,* 286 *U. S.* 374, 52 *S. Ct.* 581, 76 *L. Ed.* 1167 (1932).

██ If the states may regulate truck weights and sizes without running afoul of the Commerce Clause, the enforcement of such legislation may be accomplished by any class of police officer in whom such authority is generally vested, so long as there is no discrimination against interstate traffic. We note that under similar legislation in our sister states, local as well as state police officers are authorized to enforce vehicle weight limits. See, *e. g., New York Vehicle and Traffic Law,* McKinney's Consol. Laws, c. 71, § 393. There is no suggestion made here that local law enforcement against weight violators, as distinguished from state enforcement, has been conducted in a manner so as to work any discrimination against interstate traffic; absent such discrimination, any incidental burden on commerce by reason of the enforcement of valid state laws does not offend the United States Constitution.

The judgment of conviction below is therefore affirmed.